## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Bankruptcy Case No. 09-50779 |
| Dennis E. Hecker, | Chapter 7 |
| Debtor. | |
| Randall L. Seaver, Trustee, | Adv. Pro. No. 09-05045 |
| Plaintiff, | |

v.

Dennis E. Hecker, Midwest Motors, LLC,
LKMCD Properties, LLC, Chrysler Financial
Services Americas LLC, Toyota Motor Credit
Corporation, Toyota Financial Savings Bank,
Inver Grove Motors LLC, d/b/a Denny
Hecker's Inver Grove Toyota, Jacob Holdings
of Highway 110 LLC, Jacob Holdings of
Akron Avenue LLC,

Defendants,

| | |
|---|---|
| Mackall, Crounse & Moore, PLC, | Adv. Pro. No. 10-05015 |
| Plaintiff, | |

vs.

Dennis E. Hecker; Chrysler Financial Services
Americas LLC; Toyota Motor Credit
Corporation; Toyota Financial Savings Bank;
Inver Grove Motors LLC d/b/a Denny
Hecker's Inver Grove Toyota; and Jacob
Holdings of Highway 110 LLC, Randall L.
Seaver, Trustee, CornerStone Bank,
CornerStone Holding Company, Inc. and
Blackstone Financial, LLC,

Defendants.

1

## EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE

### INTRODUCTION

1. The undersigned parties have entered into this Settlement Agreement and Release with respect to (i) all parties making an appearance in the above-referenced Adversary Proceeding No. 09-05045 involving a Personal Services Agreement ("PSA Dispute") save and except the Debtor, Dennis E. Hecker, and (ii) all defendants in Adversary Proceeding No. 10-05015 involving the disposition of certain funds relating to the transaction that gave rise to the PSA Dispute and that are now held under an escrow agreement (the "Interpleader Action"), save and except the Debtor, CornerStone Bank, CornerStone Holding Company, Inc. and Blackstone Financial, LLC.

2. The undersigned have entered into this Settlement Agreement in response to (i) the Amended Complaint filed by Randall L. Seaver, Trustee ("Trustee") in the PSA Dispute against Dennis E. Hecker ("Debtor"); Midwest Motors, LLC ("Midwest"); LKMCD Properties, LLC ("LKMCD"); Chrysler Financial Services Americas LLC ("Chrysler"); Toyota Motor Credit Corporation ("TMCC"); Toyota Financial Savings Bank ("TFSB"); Inver Grove Motors, LLC, d/b/a Denny Hecker's Inver Grove Toyota ("Seller"); Jacob Holdings of Highway 110 LLC ("JH110") and Jacob Holdings of Akron Avenue LLC ("JH Akron"). (Midwest, LKMCD, Chrysler, TMCC and TFSB are sometimes collectively referred to as the "Defendant Parties") and (ii) in the Interpleader Action. Seller, JH110 and JH Akron did not make any appearance or answer the Complaint of the Trustee in the PSA Dispute. Seller, JH110 and JH Akron did not answer the Complaint in the Interpleader Action.

2

## THE PERSONAL SERVICES AGREEMENT

3.     The Personal Services Agreement ("PSA") was agreed to by Debtor personally and Twin Cities Automotive, LLC as part of an agreement by which Twin Cities Automotive, LLC was to acquire substantially all of the assets of the Toyota automobile dealership owned by Seller and operated out of a location in Inver Grove Heights, Minnesota (the "Dealership Assets"). The PSA is attached as Exhibit A hereto and provides, among other things, for the payment to Debtor of compensation for personal services to be actually rendered by Debtor pursuant to the PSA payable in 48 equal monthly installments of $20,833.33, each commencing as of the date of the closing of the purchase of the Seller's interest in the Dealership Assets.

4.     Toyota Motor Sales USA ("TMS") and its affiliates held certain rights of first refusal with respect to the sale of all or a substantial portion of the Dealership Assets and real property upon which the Seller's dealership was operated, which right of first refusal TMS exercised after being presented with a copy of the Purchase Agreement between Seller and Twin Cities Automotive, LLC. After exercising its right of first refusal, TMS assigned its interest in the Purchase Agreement to Stephen J. McDaniels, who subsequently assigned his rights therein to Midwest. Midwest did not negotiate any of the terms of the PSA, as it was contractually bound by the terms thereof as assignee. Midwest closed on the purchase of the Seller's Dealership Assets and related real property on terms and conditions that Midwest believes were substantially identical to and for the total consideration agreed to be paid by Twin Cities Automotive, LLC for the Seller's dealership assets, including entry into the PSA.

5.     LKMCD simultaneously acquired the real property upon which Seller operated its business from JH110 and JH Akron. The purchase of the properties and the Dealership Assets were approved by this Court pursuant to an Order dated June 18, 2009, which approved a

3

settlement agreement between the Trustee, Seller, Midwest, the Debtor and other parties (the "Stipulation"). The parties agreed that nothing in the Stipulation or the Order would prejudice any rights, claims or interests, including without limitation, any security interest or lien of the parties to the Stipulation or any creditor of any party to the Stipulation in the payments to be made pursuant to the PSA.

6.    On September 29, 2009, the Trustee commenced the PSA Dispute to determine , among other things: (i) the interests of the Debtor, Trustee, Seller and all Defendant Parties in and to the amounts payable to Debtor under the PSA; (ii) the validity of Midwest's contention that it was entitled to cancel the PSA and to seek the return of amounts paid by Midwest into escrow with the Trustee, and (iii) the extent of Midwest's continuing obligations under the PSA in light of its purported termination of the PSA and its cessation of any rights and obligations of Midwest under the PSA to Debtor or any third party.

7.    Debtor, Chrysler, TMCC and TFSB have each claimed rights and interests in and to the amounts payable under the PSA. The Trustee, Chrysler, TMCC and TFSB have further claimed that amounts payable under the PSA were disguised purchase consideration and constitute an attempted diversion to Debtor of the proceeds of the Seller's Dealership Assets and the related real property and improvements thereon sold by JH110 and JH Akron to LKMCD. Midwest further claims that it had the right to cancel the PSA and to seek the return of amounts paid by Midwest into escrow with the Trustee. Midwest also has sought an Order terminating Midwest's obligations under the PSA and the cessation of any rights and obligations under the PSA to Debtor or any third party.

8.    After the closing of the purchase of the Dealership Assets, and pursuant to the terms of the Stipulation, Midwest made four (4) monthly payments under the PSA to the Trustee,

totaling $83,333.32. Thereafter, Midwest notified the Debtor that it would refuse to accept any personal services from the Debtor, relying upon the specific language contained in the PSA as well as the then well-publicized actions of the Debtor. Before the Debtor filed bankruptcy, there was very little negative press involving the Debtor or the Debtor's personal and business entities. Midwest alleges that it suspended payment of any further amounts due under the PSA pursuant to Section 11 of the PSA as a result of the Trustee's commencement of claims that the amounts payable by Midwest under the PSA should be characterized as consideration due Seller, JH110 and/or JH Akron for the sale of their respective assets.

9.      Midwest asserts that it formally terminated the PSA by giving written notice to the Debtor that his actions would materially and adversely impact the business, reputation and good will of Midwest and Midwest's affiliates. A copy of Midwest's notice to the Debtor is attached hereto as Exhibit B.

10.     Midwest has been using its best efforts with all parties, including the Debtor, to resolve the claims made by the Trustee, Chrysler, TMCC and TFSB respecting the PSA, which claims constitute events entitling Midwest to suspend payments under paragraph 11 of the PSA and entitle Midwest to use the amounts otherwise payable under the PSA -

> (y) to pay any party that is determined by a court of competent jurisdiction, or by any receiver, trustee or creditor appointed by a court of competent jurisdiction, to be legally entitled to receipt of such Fees or (z) as provided for in Section 12 [of the PSA].[1]

11.     Seller, JH110 and JH Akron have not made any appearance or answer in the PSA Dispute. Trustee is presently the majority owner of the equity interests of the Seller, JH110 and JH Akron, as a result of the Debtor's bankruptcy filing.

---

[1] *PSA*, ¶ 11.

5

12. Midwest further asserts that it has diligently attempted to resolve the claims of all parties to the present proceeding, including the claims of the Debtor, Trustee and all parties claiming an interest in the PSA. Pursuant to the terms of the PSA, the Debtor specifically granted to Midwest, as successor to Twin Cities Automotive, LLC, certain powers with respect to Midwest's ability to resolve any claims under the PSA:

> For the avoidance of doubt, the term commercially reasonable efforts in this context shall include that [Midwest] will not settle any Claims for a period of at least six (6) months from the date a Claim is first asserted, in litigation or otherwise, and notice thereof has been provided to Hecker. [Midwest] . . . shall present to Hecker any settlements it intends to enter into in advance for his approval, which settlements shall be deemed to be approved by Hecker unless [Midwest] has breached its obligations to use commercially reasonable efforts to defend.[2]

Midwest asserts that it and its affiliates have used all commercially reasonable efforts to defend against the claims made by the Trustee, Chrysler, TFSB and TMCC respecting the PSA Dispute.

13. Trustee, within his capacity as Trustee and as the holder of the Debtor's equity interests in Seller, JH110 and JH Akron, and Defendant Parties, have agreed to resolve any and all claims, rights, obligations or otherwise in and to the PSA and with respect to the Trustee's Adversary Complaint in the PSA Dispute as set forth herein.

14. Midwest has presented to Debtor this settlement and advised Debtor that it intends to enter into this settlement, and Debtor has refused to give his approval to this settlement. Debtor is the only party to the PSA dispute not willing to accept this Settlement Agreement.

15. Midwest, LKMCD, Trustee and Defendant Parties agree that they will seek Bankruptcy Court approval of this settlement and request that the Court specifically find that such settlement is binding upon the Debtor pursuant to Paragraph 12.b of the PSA.

---

[2] *PSA*, ¶ 12b (emphasis added).

6

## THE INTERPLEADER ACTION

16.     In connection with the Interpleader Action, Mackall, Crounse & Moore, PLC ("MCM") has deposited the sum of $350,774.26 (the "Escrow Property") with the Trustee representing the principal balance of $358,994.99 remaining after payment of a portion of the escrow proceeds to Toyota Motor Sales USA, Inc. ("TMS"), plus additional accrued interest thereon of $1,779.27, less $10,000.00 of fees and expenses incurred by MCM in connection with the Interpleader Action. The escrow account was established as part of the Purchase Agreement transaction for the sale of the Dealership Assets by Seller.

17.     TMS has acknowledged to MCM as escrow agent that TMS is not due any additional sums from the Escrow Property, while the Trustee, Chrysler, TFSB and TMCC have all made claims in and to the Escrow Property. Debtor has no interest in the Escrowed Property, save and except any interest he may indirectly have as a result of his bankruptcy estate's ownership interest in the Seller, JH110 and JH Akron. Midwest and LKMCD have no claim or interest in the Escrow Property. CornerStone Bank, CornerStone Holding Company, Inc. and Blackstone Financial, LLC have made an appearance in the Interpleader Action and have been added as Defendants by Order of the Bankruptcy Court. CornerStone Bank, CornerStone Holding Company, Inc. and Blackstone Financial, LLC claim interests in the Escrow Property only through Debtor's bankruptcy estate's rights therein.

18.     The Trustee, as Trustee and as the holder of Debtor's equity interests in Seller, JH110 and JH Akron, and Chrysler, TFSB and TMCC have agreed to settle the competing claims to the Escrow Property as provided herein and to seek Court approval for the disposition of the Escrow Property as set forth in this Settlement Agreement.

7

## SETTLEMENT TERMS

### *PSA Dispute Settlement*

A. For and in consideration of any and all obligations which Midwest may have under the PSA to Debtor, Trustee, Chrysler, TMCC, TFSB, Seller, JH110 and/or JH Akron, Midwest shall pay the sum of $500,000 in complete satisfaction of any and all obligations which Midwest and/or LKMCD may have to any party, including Debtor under the PSA. The sum of $500,000 shall be paid by or on behalf of Midwest as follows:

    i.    Upon entry by the Bankruptcy Court of an order (the "Approval Order") approving this Settlement Agreement, and the Approval Order becoming final and non-appealable (the "Final Approval Order"), Trustee shall retain $65,000 of the amount that it has received from Midwest and held in escrow to date, and Trustee shall release the sum of $18,333.32 to TFSB.

    ii.    Within three days of entry of the Approval Order, Midwest shall deposit the sum of Four Hundred Sixteen Thousand Six Hundred Sixty-Six and 68/100ths Dollars ($416,666.68) with the Bankruptcy Court under Adv. Proc. 09-05045 to be held until the Approval Order becomes a Final Approval Order. When the Approval Order becomes a Final Approval Order, the amount held by the Bankruptcy Court under deposit shall be distributed, as soon thereafter as reasonably practicable, as follows:

| | |
|---|---|
| Chrysler | $150,000.00 |
| TFSB | $266,666.68 |

If the Approval Order is reversed or modified on appeal and the order reversing or modifying the Approval Order becomes final and non-appealable, the funds deposited by Midwest with the Bankruptcy Court shall be promptly returned to Midwest and the Trustee shall continue to hold

in escrow the funds he has received to date until final disposition of this matter by Court Order or other Settlement Agreement approved by the Court.

B. When the Approval Order becomes a Final Approval Order, the Debtor's promissory note executed by Debtor in favor of LKMCD evidencing a $100,000 loan made by LKMCD to Debtor following the closing of the purchase of the assets by Midwest and secured by all amounts payable to Debtor under the PSA shall be returned to Debtor marked "Paid in Full," with Debtor having no further obligations thereunder.

C. When the Approval Order becomes a Final Approval Order, Midwest shall deliver to Debtor title to a 2007 Toyota Tundra, VIN 5TBDV58187S458 (the "Toyota Tundra"). Midwest shall satisfy any outstanding liens or claims Toyota Motor Sales, U.S.A., Inc. ("TMS") or TMCC may have against the Toyota Tundra by providing full payment of all outstanding obligations owed to TMS or TMCC (as the case may be) secured by such vehicle. All payments made by Midwest related to the Toyota Tundra shall be in addition to the PSA settlement payments provided above and the Escrow Property. Midwest shall cause a certificate of title to be issued in favor of Debtor free and clear of any existing liens or lease rights of Midwest or TMCC. Such vehicle shall be conveyed to Debtor "AS IS" and without any warranties as to condition or otherwise.

### *Interpleader Action Settlement*

D. Upon entry of the Approval Order, the Escrow Property shall be distributed as follows:

| | |
|---|---|
| Chrysler | $150,000.00 |
| TMCC | $5,000.00 |
| TFSB | $195,774.26 |
| TOTAL: | $350,774.26 |

9

*Generally Applicable Settlement Terms*

E.  This Agreement is not enforceable until the Bankruptcy Court enters the Approval Order. All parties hereto reserve all of their rights and defenses in and to the PSA Dispute and the Interpleader Action in the event an Approval Order is not obtained or any third party successfully appeals such Approval Order.

F.  In exchange for the payments made herein, each party to this Agreement hereby releases each and every other party to this agreement, its predecessors, successors and assigns, along with the current and former officers, directors, shareholders, employees, agents, representatives, parent corporations, subsidiaries and affiliates from any and all claims, counterclaims, actions, losses, damages, costs and expenses (including attorneys' fees) or otherwise that have been or should have been raised in and to the PSA Dispute or in any way related to the PSA, the $100,000 loan made by LKMCD to Debtor, the Toyota Tundra to be transferred to the Debtor by Midwest pursuant to this Agreement, the Interpleader Action, or any and all rights any of them may have in the Escrow Property. Except for TMCC, the parties also release Midwest and LKMCD for any claims related to the consideration payable for the assets of Seller, or the proceeds of the purchase price payable by LKMCD for the real property purchased from JH110 and JH Akron, or otherwise against Midwest, LKMCD or any and all of their respective owners, officers, directors, governors, insurers or attorneys. Notwithstanding the foregoing, however, none of the Trustee, Chrysler, TMCC or TFSB are releasing any rights against Debtor, the Debtor's bankruptcy estate, Seller, JH110, JH Akron, or with respect to any distributions or other property that may be recovered or made available by the Debtor or the Debtor's bankruptcy estate.

G.  Notwithstanding anything to the contrary herein, nothing in this Agreement (or

10

any Approval Order ) shall release, modify, alter, or amend any agreements, notes, security instruments, guaranty agreements, or other documents (collectively, the "TMCC Documents") by and between TMCC and Midwest, LKMCD, Stephen J. McDaniels, and/or any of their affiliates (collectively, the "McDaniels Parties"), or any obligations the McDaniels Parties may owe to TMCC under such TMCC Documents or applicable law, including but not limited to, any agreements related to the acquisition of assets of Seller, JH110 and JH Akron by the McDaniels Parties.

H.     Trustee will consent to any corporate or entity resolution on behalf of Seller, JH110 and JH Akron necessary to effect this settlement.

I.     Midwest and LKMCD make the payments and other consideration hereunder without admitting any liability or otherwise, and do so for the sole purpose of intending to resolve any and all claims brought against either of them in connection with the PSA, or any claims of lack of adequate consideration payable for the purchase of the Dealership Assets from Seller or the real estate upon which such dealership is operated, the loan made by LKMCD to Debtor, or otherwise.

J.     The parties hereto acknowledge that any and all payments hereunder and the settlement and releases provided herein are specifically conditioned upon entry of a Final Approval Order.

K.     The parties hereto also acknowledge that all obligations of Midwest, LKMCD and any other party are conditioned upon the Court's approval and granting an Order that Midwest has used all commercially reasonable efforts to defend the claims and that this settlement shall be deemed to have been approved by Debtor pursuant to paragraph 12(b) of the PSA, and that Debtor shall be bound by the terms hereof.

11

L.  In the event of the Debtor or any third party appeals any Approval Order , the following terms shall control:

      i.  Implementation of this Agreement is stayed pending all appeals until final judgment or order is entered and no further appeals remain;

      ii.  MCM will act as lead appellate counsel defending this Agreement and representing Midwest Motors and LKMCD;

      iii.  Other parties to the Agreement reserve the right to retain counsel to represent their respective interests; and

      iv.  For any services rendered by MCM or costs incurred by MCM related to an appeal of such Approval Order , Trustee, Chrysler and TFSB agree to indemnify and hold harmless Midwest and LKMCD up to an aggregate amount of the first $200,000 for attorneys' fees, costs and expenses incurred by Midwest and/or LKMCD with respect to such appeal ("Appeal Obligations"). Chrysler shall pay 35% of the Appeal Obligations; provided, however, that Chrysler's share of the Appeal Obligations shall not exceed $70,000. The Trustee shall pay 7.6% of the Appeal Obligations; provided, however, that the Trustee's share of the Appeal Obligations shall not exceed $15,200. TFSB shall pay 57.4% of the Appeal Obligations; provided, however, that TFSB's share of the Appeal Obligations shall not exceed $114,800.

M.    This Agreement does not constitute an admission by any party, either explicitly or implicitly, of any allegations cited in the factual recitations above. This Agreement shall not be admissible in evidence in any proceeding, except to the extent such action or proceeding involves or relates to the enforcement or performance of this Agreement subsequent to Bankruptcy Court approval of this Agreement.

N.    This Agreement represents the complete agreement of the parties and terminates all prior oral and written agreements and supersedes all communications between the parties. No promise, inducement or other agreement has been made to solicit acceptance of this Agreement.

O.    This Agreement shall be governed by the laws of Minnesota and any applicable provisions of Title 11 of the United States Code. The Court in which Debtor's bankruptcy case is pending shall retain jurisdiction over enforcement and interpretation of this Agreement.

P.    This Agreement may be executed in any number of counterparts.

AGREED AND ACCEPTED:

CHRYSLER FINANCIAL SERVICES
AMERICAS LLC

Dated: May___, 2010            By_____
                                Its: V.P. Dealer Credit + Nat'l Accts.

MIDWEST MOTORS, LLC

Dated: May___, 2010            By_____
                                Stephen J. McDaniels
                                Its: Chief Manager

13

M. This Agreement does not constitute an admission by any party, either explicitly or implicitly, of any allegations cited in the factual recitations above. This Agreement shall not be admissible in evidence in any proceeding, except to the extent such action or proceeding involves or relates to the enforcement or performance of this Agreement subsequent to Bankruptcy Court approval of this Agreement.

N. This Agreement represents the complete agreement of the parties and terminates all prior oral and written agreements and supersedes all communications between the parties. No promise, inducement or other agreement has been made to solicit acceptance of this Agreement.

O. This Agreement shall be governed by the laws of Minnesota and any applicable provisions of Title 11 of the United States Code. The Court in which Debtor's bankruptcy case is pending shall retain jurisdiction over enforcement and interpretation of this Agreement.

P. This Agreement may be executed in any number of counterparts.

AGREED AND ACCEPTED:

CHRYSLER FINANCIAL SERVICES
AMERICAS LLC

Dated: May    , 2010                    By_____

Its:_____

MIDWEST MOTORS, LLC

Dated: May    , 2010                    By_____

Stephen J. McDaniels
Its: Chief Manager

13

LKMCD PROPERTIES, LLC

Dated: May ___, 2010          By_____

Stephen J. McDaniels
Its: Chief Manager

TOYOTA MOTOR CREDIT CORPORATION

Dated: May ___, 2010          By_____

Its:_____

TOYOTA FINANCIAL SERVICES BANK

Dated: May ___, 2010          By_____

Its:_____

Dated: May ___, 2010          _____

Randall L. Seaver, Trustee

INVER GROVE MOTORS LLC

Dated: May ___, 2010          By_____

Randall L. Seaver
Trustee

JACOB HOLDINGS OF HIGHWAY 110 LLC

Dated: May ___, 2010          By_____

Randall L. Seaver
Trustee

JACOB HOLDINGS OF AKRON LLC

Dated: May ___, 2010          By_____

Randall L. Seaver
Trustee

14

LKMCD PROPERTIES, LLC

Dated: May   , 2010                    By_____
                                             Stephen J. McDaniels
                                             Its:  Chief Manager

                                       TOYOTA MOTOR CREDIT CORPORATION

Dated: May   , 2010                    By_____
                                             _____
                                             Its:_____

                                       TOYOTA FINANCIAL SERVICES BANK

Dated: May   , 2010                    By_____
                                             _____
                                             Its:_____

Dated: May   , 2010                    _____
                                       Randall L. Seaver, Trustee

                                       INVER GROVE MOTORS LLC

Dated: May   , 2010                    By_____
                                             Randall L. Seaver
                                             Trustee

                                       JACOB HOLDINGS OF HIGHWAY 110 LLC

Dated: May   , 2010                    By_____
                                             Randall L. Seaver
                                             Trustee

                                       JACOB HOLDINGS OF AKRON LLC

Dated: May   , 2010                    By_____
                                             Randall L. Seaver
                                             Trustee

14

LKMCD PROPERTIES, LLC

Dated: <u>May</u>  , 2010          By_____

                                  Stephen J. McDaniels
                                  Its:  Chief Manager

                                  TOYOTA MOTOR CREDIT CORPORATION

Dated: <u>May</u>  , 2010          By_____

                                  Its:_____

                                  *SAVINGS*
                                  TOYOTA FINANCIAL ~~SERVICES~~ BANK

Dated: <u>May 14</u>, 2010         By_____

                                  Its: *PRESIDENT - CEO*

Dated: <u>May</u>  , 2010          _____

                                  Randall L. Seaver, Trustee

                                  INVER GROVE MOTORS LLC

Dated: <u>May</u>  , 2010          By_____

                                  Randall L. Seaver
                                  Trustee

                                  JACOB HOLDINGS OF HIGHWAY 110 LLC

Dated: <u>May</u>  , 2010          By_____

                                  Randall L. Seaver
                                  Trustee

                                  JACOB HOLDINGS OF AKRON LLC

Dated: <u>May</u>  , 2010          By_____

                                  Randall L. Seaver
                                  Trustee

14

LKMCD PROPERTIES, LLC

Dated: May___, 2010                By_____
                                        Stephen J. McDaniels
                                        Its: Chief Manager

                                   TOYOTA MOTOR CREDIT CORPORATION

Dated: May___, 2010                By_____

                                        Its:_____

                                   TOYOTA FINANCIAL SERVICES BANK

Dated: May___, 2010                By_____

                                        Its:_____

Dated: May___, 2010                _____
                                        Randall L. Seaver, Trustee

                                   INVER GROVE MOTORS LLC

Dated: May___, 2010                By_____
                                        Randall L. Seaver
                                        Trustee

                                   JACOB HOLDINGS OF HIGHWAY 110 LLC

Dated: May___, 2010                By_____
                                        Randall L. Seaver
                                        Trustee

                                   JACOB HOLDINGS OF AKRON LLC

Dated: May___, 2010                By_____
                                        Randall L. Seaver
                                        Trustee

14

APPROVED AS TO FORM AND CONTENT:

Dated: May    , 2010

MACKALL, CROUNSE & MOORE, PLC

William J. O'Brien (#184822)
Andrew P. Moratzka (#322131)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, MN 55402
(612) 305-1400
ATTORNEYS FOR DEFENDANTS
MIDWEST MOTORS, LLC, and LKMCD
PROPERTIES, LLC

Dated: May    , 2010

LEONARD, O'BRIEN, SPENCER, GALE
& SAYRE, LTD.

Matthew R. Burton (#210018)
James M. Jorissen (#262833)
100 S 5th St, Suite 2500
Minneapolis, MN 55402
(612) 332-1030

ATTORNEYS FOR TRUSTEE
RANDALL L. SEAVER

Dated: May    , 2010

GRAY, PLANT, MOOTY, MOOTY &
BENNETT, P.A.

Nicholas N. Nierengarten (#79169)
Stephen F. Grinnell (#37928)
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 632-3040

MAYER BROWN LLP
Howard J. Roin, admitted *Pro Hac Vice*
Stuart M. Rozen, admitted *Pro Hac Vice*
71 South Wacker Drive
Chicago, IL 60606
(312) 701-7302

15

APPROVED AS TO FORM AND CONTENT:

Dated: May    , 2010

MACKALL, CROUNSE & MOORE, PLC

_____

William J. O'Brien (#184822)
Andrew P. Moratzka (#322131)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, MN 55402
(612) 305-1400
ATTORNEYS FOR DEFENDANTS
MIDWEST MOTORS, LLC, and LKMCD
PROPERTIES, LLC

Dated: May 24, 2010

LEONARD, O'BRIEN, SPENCER, GALE
& SAYRE, LTD.

_____

Matthew R. Burton (#210018)
James M. Jorissen (#262833)
100 S 5th St, Suite 2500
Minneapolis, MN 55402
(612) 332-1030

ATTORNEYS FOR TRUSTEE
RANDALL L. SEAVER

Dated: May    , 2010

GRAY, PLANT, MOOTY, MOOTY &
BENNETT, P.A.

_____

Nicholas N. Nierengarten (#79169)
Stephen F. Grinnell (#37928)
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 632-3040

MAYER BROWN LLP
Howard J. Roin, admitted *Pro Hac Vice*
Stuart M. Rozen, admitted *Pro Hac Vice*
71 South Wacker Drive
Chicago, IL 60606
(312) 701-7302

15

APPROVED AS TO FORM AND CONTENT:

Dated: May    , 2010

MACKALL, CROUNSE & MOORE, PLC

_____

William J. O'Brien (#184822)
Andrew P. Moratzka (#322131)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, MN 55402
(612) 305-1400
ATTORNEYS FOR DEFENDANTS
MIDWEST MOTORS, LLC, and LKMCD
PROPERTIES, LLC

Dated: May    , 2010

LEONARD, O'BRIEN, SPENCER, GALE
& SAYRE, LTD.

_____

Matthew R. Burton (#210018)
James M. Jorissen (#262833)
100 S 5th St, Suite 2500
Minneapolis, MN 55402
(612) 332-1030

ATTORNEYS FOR TRUSTEE
RANDALL L. SEAVER

Dated: May 24, 2010

GRAY, PLANT, MOOTY, MOOTY &
BENNETT, P.A.

Nicholas J. Nierengarten (#79169)
Stephen F. Grinnell (#37928)
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 632-3040

MAYER BROWN LLP
Howard J. Roin, admitted *Pro Hac Vice*
Stuart M. Rozen, admitted *Pro Hac Vice*
71 South Wacker Drive
Chicago, IL 60606
(312) 701-7302

15

ATTORNEYS FOR DEFENDANT CHRYSLER
FINANCIAL SERVICES AMERICAS LLC

Dated: May 24, 2010

PETERS LAW FIRM, P.L.C.

Timothy J. Peters (#269979)
2116 Second Avenue South
Minneapolis, MN 55404
(612) 746-1475

REED SMITH LLP
Gregory L. Taddonio, admitted *Pro Hac Vice*
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-7102

ATTORNEYS FOR DEFENDANT TOYOTA
MOTOR CREDIT CORPORATION

Dated: May , 2010

RAVICH MEYER KIRKMAN MCGRATH
NAUMAN & TANSEY, P.A.

Will R. Tansey (#0323056)
4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-8511

K&L GATES LLP
Michael B. Lubic, admitted *Pro Hac Vice*
10100 Santa Monica Blvd., 7th Floor
Los Angeles, CA 90067
(310) 552-5000

ATTORNEYS FOR DEFENDANT
TOYOTA FINANCIAL SAVINGS BANK

16

ATTORNEYS FOR DEFENDANT CHRYSLER
FINANCIAL SERVICES AMERICAS LLC

Dated: May    , 2010                    PETERS LAW FIRM, P.L.C.

_____
Timothy J. Peters (#269979)
2116 Second Avenue South
Minneapolis, MN 55404
(612) 746-1475

REED SMITH LLP
Gregory L. Taddonio, admitted *Pro Hac Vice*
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-7102

ATTORNEYS FOR DEFENDANT TOYOTA
MOTOR CREDIT CORPORATION

Dated: May 25 2010                    RAVICH MEYER KIRKMAN MCGRATH
NAUMAN & TANSEY, P.A.

_____
Will R. Tansey (#0323056)
4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-8511

K&L GATES LLP
Michael B. Lubic, admitted *Pro Hac Vice*
10100 Santa Monica Blvd., 7th Floor
Los Angeles, CA 90067
(310) 552-5000

ATTORNEYS FOR DEFENDANT
TOYOTA FINANCIAL SAVINGS BANK

16

EXHIBIT A

Personal Services Agreement

## PERSONAL SERVICES AGREEMENT

**THIS PERSONAL SERVICES AGREEMENT** (the "Agreement") is made and entered into effective upon the Effective Date (as defined below) by and between TWIN CITIES AUTOMOTIVE, LLC, a Delaware limited liability company (the "Company"), and DENNIS E. HECKER, an individual resident of the state of Minnesota ("Hecker").

**WHEREAS,** Hecker has owned, operated and managed numerous automotive dealerships and other businesses related to the automotive industry for more than 35 years, such that Hecker has developed a recognized understanding and expertise within the automotive industry; and

**WHEREAS,** the Company has recently underwent a period of significant growth and desires to have access to parties with experience and skills who will assist the Company manage and integrate its growing operations; and

**WHEREAS,** Hecker possesses the skill set and experience desired by the Company and, therefore, the Company desires to retain Hecker to render services to the Company on the terms and conditions set forth in this Agreement; and

**WHEREAS,** Hecker desires to be retained by the Company on such terms and conditions.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements contained herein, the parties agree as follows:

1.      **Services and Performance of Duties.** The Company hereby retains Hecker to provide the Services (as defined below) to the Company. In providing the Services, Hecker shall devote such time, energy and skills as are reasonably necessary to discharge Hecker's duties hereunder.  Hecker shall report to and be subject to the direction of the President of the Company.  Hecker shall conduct the Services at such times as directed by the President of the Company.  The Services shall include one or more of the following: assist in the integration and operation of the Company's affiliated automotive dealerships in the state of Minnesota, whether now owned or hereafter acquired (the "Dealerships"); assist in strategic planning for the Dealerships; assist and recommend advertising programs and strategies for the Dealerships; assist with manufacturer relationships for the Dealerships; develop and assist with fleet sales for the Dealerships; develop and assist in used car marketing and wholesale strategies for the Dealerships; assist in planning, development and construction of facilities and improvements for the Dealerships; assist in finding, analyzing and contracting dealerships for acquisition; and to provide such other services as are reasonably requested by the Company, and Hecker hereby agrees to provide the Services.

2.      **Term.** The term of this Agreement (the "Term") shall commence upon the Closing of the transactions contemplated by (and as such term is defined in) that certain Asset Purchase Agreement between Twin Cities Toyota, LLC ("Buyer"), Inver Grove Motors LLC, and Hecker dated of even date herewith (the "Asset Purchase Agreement," and such date, the "Effective Date") and shall continue for a period of four (4) years, unless earlier terminated in accordance with this Agreement. Notwithstanding anything in this Agreement to the contrary, if

CONFIDENTIAL

the Closing does not occur for any reason, this Agreement will not become effective and will be null and void ab initio. The Company may terminate this Agreement by written notice to Hecker:

(a) in the event Hecker breaches any representation, warranty, or covenant made by Hecker hereunder;

(b) in the event Hecker fails to provide the Services as set forth herein and such failure is not remedied within thirty (30) days following written notice from the Company regarding such failure; or

(c) in the event Hecker takes any action that adversely impacts the business, reputation or goodwill of the Company or any of the Company's affiliates in any material manner.

3. **Fees.** As compensation for the Services rendered under this Agreement, the Company shall pay Hecker fees equal to One Million Dollars ($1,000,000) (the "Fees"), payable in forty-eight (48) equal, monthly installments of $20,833.33 commencing on the Effective Date. Fees paid under this Agreement shall not be subject to withholding for federal, state or local income or employment taxes, including withholding for FICA contributions. Hecker shall be solely responsible for any and all federal, state and local income taxes, FICA payments and other required deductions, payments or contributions.

4. **Expense Reimbursement.** The Company shall reimburse Hecker for all reasonable expenses, including reasonable travel expenses, incurred by Hecker on behalf of the Company during the Term of this Agreement, as approved by the Company in advance and upon submission of appropriate documentation of such expenses.

5. **Nature of Relationship.** Hecker is an independent contractor and neither Hecker nor any employee or agent of Hecker shall be deemed to be an employee of the Company for the purposes of any employee benefit programs, income tax withholding, FICA taxes, unemployment benefits, workers compensation benefits, or otherwise. Hecker shall not have any authority to assume or create any obligation, express or implied, on behalf of the Company.

6. **Hecker's Warranties, Representations, and Covenants.** Hecker represents, warrants, and covenants to the Company that (i) Hecker shall comply with and not violate any applicable laws in the performance of the Services under this Agreement; (ii) Hecker shall render the Services in a businesslike and professional manner in accordance with generally accepted standards for the nature of the work performed, and shall act in a manner reasonably calculated to protect the good name and business reputation of the Company; (iii) Hecker shall comply with the covenants set forth in Section 16 of the Asset Purchase Agreement; and (iv) no other party has exclusive rights to Hecker's services to be performed hereunder and Hecker is in no way compromising any rights or trust relationships between any other party and Hecker, or creating a conflict of interest or any possibility thereof, for Hecker or for the Company.

7. **Nondisclosure.** Except as permitted or directed by the Company, or as may be required in the proper discharge of Hecker's duties hereunder, Hecker shall not, during the Term or at any time thereafter, divulge, furnish or make accessible to anyone or use in any way any

2

confidential, trade secret or proprietary information of the Company, including without limitation, whether or not reduced to writing, customer lists, customer files or information, business planning and financial information, contracts, sales and marketing information, business strategy or opportunities for new or developing business (collectively, the "Confidential Information"), which Hecker has prepared, acquired or become acquainted with as a result of his relationship with the Company. Hecker acknowledges that the Confidential Information is the property of the Company, constitutes a unique and valuable asset of the Company and any disclosure or other use thereof, other than for the sole benefit of the Company, would cause irreparable harm to the Company. The foregoing obligations of confidentiality shall not apply to any knowledge or information the entirety of which is now published or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement by Hecker or a breach of a confidentiality obligation owed to the Company by any third party.

8.  **Non-Solicitation.** Hecker agrees that, during the Term of this Agreement and for a period of eighteen (18) months following termination of this Agreement for any reason, Hecker will not directly or indirectly solicit, induce or attempt to induce any employee of the Company to terminate his or her employment with the Company.

9.  **Return of Property.** Upon the termination of this Agreement, or upon the Company's request, Hecker shall promptly return to the Company all documents, files or other Company property, including all copies thereof, then in Hecker's possession, control or influence, including without limitation all Confidential Information.

10.  **Injunctive Relief.** Hecker agrees that it would be difficult to compensate the Company fully for damages for any violation of the provisions of Sections 7 through 13 of this Agreement. Accordingly, Hecker specifically agrees that the Company shall be entitled to temporary and permanent injunctive relief to enforce Sections 7 through 13 of this Agreement and that such relief may be granted without the necessity of proving actual damages. This provision with respect to injunctive relief shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief. Hecker agrees that if the Company is the prevailing party, the Company shall be entitled to recover its costs of litigation and attorney fees incurred in enforcing this Agreement.

11.  **Suspension of Payments.** The Company shall have the right to suspend payment of the Fees in the event that a third party asserts (a) any claim, whether in a bankruptcy action, foreclosure action or otherwise, that all or any portion of the Fees are or should have been characterized as consideration for the transactions contemplated by the terms of the Asset Purchase Agreement, or any claims of a similar nature, or (b) any claim that the consideration paid by Buyer under the terms of the Asset Purchase Agreement was insufficient or inadequate or (c) any bankruptcy, preference, fraudulent conveyance or claims of a similar nature related to the transactions contemplated by the Asset Purchase Agreement (collectively, "Claims"). With respect to any Fees so suspended, the Company shall have the right to use or make payment of such Fees directly, or through the Buyer, (y) to any party that is determined by a court of competent jurisdiction, or by any receiver, trustee, or creditor appointed by a court of competent jurisdiction, to be legally entitled to receipt of such Fees or (z) as provided for in Section 12 hereof.

3

2328527v8

## 12. Specific Indemnity and Offsets.

(a)     In the event (i) it is determined by a court of competent jurisdiction, or a trustee, receiver, or creditor appointed by a court of competent jurisdiction, that the consideration paid by Buyer under the terms of the Asset Purchase Agreement was insufficient or inadequate, or (ii) Buyer or any affiliate of Buyer becomes obligated to pay, or agrees to pay, additional consideration or amounts (other than the consideration specified in the Asset Purchase Agreement) whether in connection with a court order, settlement or otherwise, which payment of additional consideration or amounts arises as a result of or related to any Claims, then the Company shall have the right to offset any future Fee payment obligations under this Agreement (including any payments suspended under Section 11) and apply such Fee payment obligations to satisfy in full or in part any liabilities, damages, losses, costs, and expenses incurred by Buyer or any of its affiliates in connection with any such Claims, including without limitation reasonable attorneys fees (in excess of $50,000 incurred by Buyer or any of its affiliates) and any amounts paid in settlement or other resolution of such Claims (collectively, "Losses"). In addition, Hecker shall indemnify, defend and hold harmless, the Company and any of its affiliates for any and all Losses incurred by the Company or any of its affiliates that are not offset by future Fee payment obligations as set forth above; provided, however, that in no event will such indemnification obligation be greater than the amount of the Fees actually paid to Hecker under the terms of this Agreement. The Company and Buyer are affiliates.

(b)     The Company and its affiliates will use commercially reasonable efforts to defend against any Claims so long as Hecker is not in default under the terms of this Agreement. For the avoidance of doubt the term commercially reasonable efforts in this context shall include that the Company will not settle any Claims for a period of at least six (6) months from the date a Claim is first asserted, in litigation or otherwise, and notice thereof has been provided to Hecker. Buyer or Company, as applicable, shall present to Hecker any settlements it intends to enter into in advance for his approval, which settlements shall be deemed to be approved by Hecker unless the Company or Buyer has breached its obligations to use commercially reasonable efforts to defend.

**13.     General Indemnity.** Hecker shall defend, indemnify and hold the Company harmless from and against any and all liabilities, damages, losses, costs, and expenses (including reasonable attorney fees) which the Company or any of its affiliates may incur or sustain or which may be claimed against the Company or any if its affiliates arising out of or relating to (a) Hecker's performance of the Services or a breach of Hecker's representations, warranties or covenants stated herein, or (b) any act or omission on the part of Hecker or any legal liability on the part of Hecker, in each case related to the performance of his obligations under this Agreement.

## 14. General Provisions.

**14.1     Waivers.** No failure on the part of either party to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

4

2328527v8

**14.2    Governing law.** This Agreement shall be deemed to be a contract made under the laws of the State of Minnesota and for all purposes it, plus any related or supplemental documents and notices, shall be construed in accordance with and governed by the law of such state without regard to conflict of law provisions.

**14.3    Amendments.** This Agreement may not be and shall not be deemed or construed to have been modified, amended, rescinded, canceled or waived in whole or in part, except by written instruments signed by the parties hereto.

**14.4    Entire Agreement.** This Agreement constitutes the entire agreement and understanding between the parties regarding the provision of the Services. All previous discussions, promises, representations and understandings between the parties relative to the subject matter of this Agreement, if any, have been merged into this document.

**14.5    Severability.** To the extent that any provision of this Agreement shall be determined to be invalid or unenforceable, the validity and enforceability of the remainder of such provision and of this Agreement shall be unaffected. If any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, the parties specifically authorize the tribunal making such determination to edit the invalid or unenforceable provision to allow this Agreement, and the provisions thereof, to be valid and enforceable to the fullest extent allowed by law or public policy.

**14.6    Notices.** Any written notice required or permitted hereunder to either party shall be given in writing. Such notice may be delivered by personal delivery, by deposit in the United States Mail, postage prepaid, by any national courier service or by electronically confirmed facsimile transmission with a mailed original.

**14.7    Assignment; Binding Nature.** Hecker shall not assign or transfer this Agreement or any of his rights or duties hereunder to any other person or entity without the prior written consent of the Company. All covenants, stipulations and promises in this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.

**14.8    Intended Third Party Beneficiaries.** The parties acknowledge and agree that Buyer and each of the affiliates of Buyer are intended third party beneficiaries of this Agreement.

**14.9    Survival of Terms.** The obligations contained in Sections 7 through 14 shall survive the termination of this Agreement indefinitely.

[signature page follows]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

Company:

By: _____

Name: Peter Hasselquist
Title: Chief Executive Officer

**Hecker:**

_____

Dennis E. Hecker

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Company:

By: _____
Name: Peter Hasselquist
Title: Chief Executive Officer

Hecker: _____

Dennis E. Hecker

6

# EXHIBIT B

## Termination of Personal Services Agreement

1173449 6-APM

Law Offices
1400 AT&T Tower
901 Marquette Avenue
Minneapolis, MN 55402-2859
Telephone: (612) 305-1400
Facsimile: (612) 305-1414
www.mcmlaw.com



MACKALL CROUNSE&MOORE<sub>plc</sub>

William J. O'Brien
Attorney at Law
(612) 305-1462
wjo@mcmlaw.com

September 30, 2009

EXHIBIT B

**FILE COPY**

**VIA E-MAIL**
Mr. Bruce J. Parker
Kaplan, Strangis & Kaplan, P.A.
5500 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

**CERTIFIED MAIL**   7007 - 25 60 - 0000 - 9478 - 3035
**RETURN RECEIPT REQUESTED**
Mr. Dennis E. Hecker
Inver Grove Motors, LLC
500 Ford Parkway
Minneapolis, MN 55426

> Re:   Dennis E. Hecker - Personal Services Agreement
>        Our File No. 82337-10

Dear Mr. Hecker and Mr. Parker:

I am writing to you on behalf of Midwest Motors, LLC ("Midwest Motors"), the successor to Twin Cities Automotive, LLC, with respect to that certain Personal Services Agreement between Midwest Motors, LLC and Dennis E. Hecker dated effective June 19, 2009 ("PSA").

Midwest Motors previously wrote to Mr. Hecker on July 7, 2009, spelling out the obligations of the services Mr. Hecker was expected to perform under the PSA. Numerous disclosures and claims of Mr. Hecker's actions since that correspondence have been alleged by various third parties, and these actions have been publicly disclosed through the press, court proceedings and third party investigations and what we understand to be criminal investigations. These disclosures have resulted in the public scrutiny of significant personal character issues for Mr. Hecker, which could be linked to Midwest Motors. Those issues adversely impact Midwest Motors' ability to conduct its business, as well as its reputation and the goodwill of its operations and the affiliated dealerships for whom it was contemplated Mr. Hecker would perform his consulting services required under the PSA, as the initial agreement contemplated. Pursuant to paragraph 3(c) of the PSA, Midwest Motors is terminating all of its obligations under the PSA retroactive to the Effective Date.

Recent actions and disclosures of Mr. Hecker's personal dealings have left Midwest Motors with no choice. Midwest Motors' perception of Mr. Hecker's inability to successfully perform the required consulting services for Midwest Motors and its affiliated dealerships has been crystallized by the constant barrage of negative press surrounding Mr. Hecker since the

business transaction was closed in June of this year. Mr. Hecker's purported "association" with our client was inaccurate. It is unacceptable that the business loan transaction made to Mr. Hecker and his new entity placed Mr. McDaniels personally in the public eye. The characterization of this loan as a "friendly" transaction was misleading, and resulted in both business and personal backlash for Mr. McDaniels. Prior to this complex transaction, Mr. McDaniels did not have a direct business relationship or a personal relationship of any substance with Mr. Hecker. Mr. McDaniels cannot afford to have any business or personal relationships with Mr. Hecker, nor does he have any interest in requesting any information or services from Mr. Hecker now or in the future. Mr. Hecker and Mr. McDaniels have never met to arrange for the consulting services to be performed as originally contemplated by the PSA, and Mr. McDaniels is not willing to do so at this time nor at any time in the future. Mr. McDaniels' only involvement with Mr. Hecker and his companies was through the purchase of certain assets and properties relating to the Inver Grove Toyota dealership.

Neither Mr. McDaniels nor any persons involved with Mr. McDaniels negotiated the original contractual terms for the business transactions, including but not limited to the PSA. The PSA was assigned to Midwest Motors through the legal process after all terms were finalized and negotiated with the original purchaser of the business and agreed upon by Mr. Hecker. Toyota Motor Sales USA exercised its "right of first refusal" on behalf of Mr. McDaniels and Midwest Motors based upon a 25 year positive relationship they have enjoyed. For Midwest Motors to have any association with Mr. Hecker personally would lead the public to believe that Mr. McDaniels and his automobile dealerships desire to have such a business relationship. Neither Mr. McDaniels nor his dealerships can afford to be associated in any way with Mr. Hecker. The business loan which was made to Mr. Hecker by an affiliate of Midwest Motors after closing was a direct result of the complex transactions associated with the Inver Grove Toyota purchase. The loan was part of the overall business transaction and contained normal business terms and was secured by the PSA. This letter does not impact Mr. Hecker's obligations under that loan.

With the recent federal grand jury investigations, State of Minnesota Department of Transportation and taxing authorities investigations, Mr. Hecker is not an individual with whom Midwest Motors can associate for any business purposes as intended under the PSA. Even if none of these allegations turned out to be true, Midwest Motors cannot and will not associate with or utilize the services of Mr. Hecker. The negativity associated with Mr. Hecker's personal name has become very troubling.

Midwest Motors will not engage the personal services of Mr. Hecker in the future under the PSA nor any other business. The PSA, negotiated by others and assigned to Midwest Motors as part of the overall Inver Grove Toyota transaction, requires Mr. Hecker's performance of personal services. The PSA clearly provides, however, that the contract can be terminated should events arise which prevent Mr. Hecker from performing acceptable services for Midwest Motors, LLC. The contract was negotiated by Mr. Hecker and Twin Cities Automotive Group (Midwest Motors' predecessor in interest to the Purchase Agreement) prior to Mr. Hecker's

bankruptcy filing and the continuous extreme negative media attention which surrounds him. These events prevent Midwest Motors, LLC and its affiliates from being able to retain Mr. Hecker for any consulting services in any capacity. Any affiliation with Mr. Hecker can only be perceived as detrimental.

There have been four (4) initial monthly payments which have been made by Midwest Motors to Mr. Hecker's bankruptcy trustee which are being held in escrow. We will be seeking a release of those payments and will engage in discussions directly with the Chapter 7 Trustee for Mr. Hecker's bankruptcy estate to obtain a release of those funds.

One of the conditions for any indemnification of Mr. Hecker and any defense of the PSA is that Mr. Hecker shall not be in default under the terms of the PSA. Pursuant to the provisions contained in paragraph 2(c) of the PSA, Midwest Motors deems Mr. Hecker to be in default thereof for his inability to perform personal services acceptable to Midwest Motors. Midwest Motors has no obligation to defend any claims which may be made against Mr. Hecker with respect to the PSA, including those brought by the Bankruptcy Trustee.

Very truly yours,

MACKALL, CROUNSE & MOORE, PLC

William J. O'Brien

cc:     Stephen J. McDaniels (Via e-mail)
        Andrew P. Moratzka, Esq. (Via e-mail)
        Greg Taddonio, Esq. (Via e-mail)
        Michael Lubic, Esq. (Via e-mail)

WJO/clh/1093045v1