## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | BKY No. 09-50779 |
| DENNIS E. HECKER, | Chapter 7 |
| Debtor. | |

| | |
|---|---|
| CORNERSTONE BANK;<br>CORNERSTONE HOLDING CO., INC.;<br>and BLACKSTONE FINANCIAL, LLC, | Civil No. 09-3645 (JRT) |
| Appellants, | **MEMORANDUM OPINION<br>AND ORDER AFFIRMING<br>THE BANKRUPTCY<br>COURT ORDER** |
| v. | |
| RANDALL L. SEAVER, Trustee, | |
| Appellee. | |

Brad A. Sinclair, **SERKLAND LAW FIRM**, 10 Roberts Street, Post Office Box 6017, Fargo, ND 58108-6017, for appellants.

Matthew R. Burton and Andrea M. Hauser, **LEONARD O'BRIEN SPENCER, GALE & SAYRE, LTD.**, 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402, for appellee.

This matter is before the Court on an appeal from an order of United States Bankruptcy Judge Robert J. Kressel, approving a transaction negotiated by bankruptcy Trustee Randall L. Seaver to sell certain assets relating to a Toyota Scion dealership near Brainerd, Minnesota, that was owned by entities in which debtor Dennis E. Hecker held a significant ownership stake. As part of the transaction, the Trustee reached a settlement agreement as to potential preference claims with Toyota Motor Credit Corporation

("TMCC"), which held first priority liens on the dealership's assets.  Cornerstone Bank, Cornerstone Holding Co., and Blackstone Financial, LLC (collectively, "Cornerstone") have security interests in Hecker's general intangibles.  Cornerstone does not object to the sale itself, but argues that the Bankruptcy Court abused its discretion in approving the settlement agreement without determining whether a legitimate preference action existed, thereby circumventing Cornerstone's interest in the settlement proceeds.  For the reasons that are discussed below, the Court affirms the Bankruptcy Court order.

## BACKGROUND

Hecker owns several entities involved with the transaction at issue.  He owns 99% of Brainerd Imports LLC ("Brainerd"), and Inver Grove Investments, Inc. owns the remaining 1%.  Hecker wholly owns Inver Grove Investments.  (Mot. for Approval of Settlement ¶ 5, Bankr. Docket No. 315.)  Brainerd owned and operated a Toyota Scion dealership in Baxter, Minnesota (Denny Hecker's Toyota Scion of Baxter, hereinafter the "Brainerd Dealership"), pursuant to a dealer agreement with Toyota Motor Sales, USA ("Toyota Motor Sales").  (Asset Purchase Agreement at 1, Docket No. 1-7.)  Hecker also owns 91% of Jacob Properties of Minnesota LLC ("Jacob Properties"), his children's trusts own 4%, and Rosedale Dodge, Inc. (wholly owned by Hecker) owns 5%.  Jacob Properties wholly owns Jacob Holdings of Baxter LLC ("JHB").  (Mot. for Approval of Settlement ¶ 6, Bankr. Docket No. 315.)  JHB owned the real property on which the Brainerd Dealership was located, and Brainerd had a lease agreement with JHB.  (Real Estate Purchase Agreement, Docket No. 1-7.)  The Brainerd Dealership and JHB, which

Hecker did not own directly, were not bankruptcy estate property. (Appellee's Br. at 16, Docket No. 6.)

Hecker petitioned for Chapter 7 bankruptcy on June 4, 2009. (Bankr. Docket No. 1.) In a Statement of Financial Affairs that Hecker signed under penalty of perjury and filed with the Bankruptcy Court on July 1, 2009, Hecker stated that in the 90 days prior to petitioning for bankruptcy, he had made payments on debts to TMCC of approximately $203,640. (Statement of Financial Affairs at AA168-71, Trustee's App., Docket No. 7.) According to the Settlement Agreement between TMCC and the Trustee, in May 2009, Hecker also transferred to TMCC "the original membership certificates for Brainerd." (Settlement Agreement at 2, Docket No. 1-7.) After Hecker petitioned for bankruptcy, TMCC was concerned that these transfers could support potential preference claims by the bankruptcy estate against TMCC pursuant to 11 U.S.C. § 547(b), which allows the Trustee to "avoid any transfer of an interest of the debtor in property . . . to or for the benefit of a creditor . . . for or on account of an antecedent debt . . .[if the transfer was] made . . . on or within 90 days before the date of the filing of the petition." 11 U.S.C. § 547(b).

Separate and apart from these pre-petition transfers, TMCC had security interests in the assets of the Brainerd Dealership and JHB. (Appellee's Br. at 14, Docket No. 6.) The Settlement Agreement between TMCC and the Trustee recites that the Brainerd Dealership assets and the JHB real property "are encumbered by perfected, first-priority liens and security interests held by TMCC." (Settlement Agreement at 2, Docket No. 1-7.) "The liens and security interests secure, *inter alia*, [the dealership's] obligations under a Loan and Security Agreement dated March 20, 2007 (in the original principal

amount of $5,445,000), an Inventory Loan and Security Agreement dated July 11, 2007, and certain other" agreements and mortgages.  (Settlement Agreement at 2, Docket No. 1-7.)

The Brainerd Dealership ceased doing business in June 2009 and had been up for sale for about six months at the time the Bankruptcy Court approved the transaction. (Appellee's Br. at 3, Docket No. 6.)  During those months when the dealership was not operating, Toyota Motor Sales had been threatening to terminate its dealership agreement with Brainerd.  (Mot. for Approval of Settlement ¶ 8, Bankr. Docket No. 315.)

On or about October 14, 2009, the Trustee removed Hecker from his position as sole governor of Brainerd.  (Asset Purchase Agreement at 1, Docket No. 1-7.)

On October 28, 2009, the Trustee sought approval of a proposed settlement between the Trustee, Hecker, and Paul M. Walser relating to Brainerd and JHB.  (Mot. for Approval of Settlement ¶ 7, Bankr. Docket No. 315.)  Hecker and Walser had negotiated that proposed settlement.  (*Id.*)  According to the proposed settlement, entities controlled by Walser would pay approximately $450,000 in cash at closing on account of Brainerd, for the benefit of Hecker.  (Mot. for Approval of Settlement ¶ 16, Bankr. Docket No. 315.)

TMCC objected to the transaction "and asked that the proceeds be escrowed until potential preference claims were resolved."  (Mot. for Approval of Settlement ¶ 15, Bankr. Docket No. 315.)  TMCC had "received alleged prepetition payments directly from the Debtor," and in May 2009, prior to the date Hecker petitioned for bankruptcy, TMCC took "possession of Debtor's membership certificates in Brainerd, thereby, in the Trustee's opinion, taking the first lien position on the Debtor's equity in Brainerd."

(Mot. for Approval of Settlement ¶ 15, Bankr. Docket No. 315.)  The Trustee "identified monetary preference claims of at least $206,000 the bankruptcy estate had against" TMCC.  (Trustee's Resp. in Opp'n to Mot. for Leave to Appeal & Mot. to Dismiss Appeal as Moot at 2, Docket No. 1-7.)  The Trustee contended that he had certain claims against TMCC related to transfers made by Hecker in the 90-day period prior to the date of petition "on the basis that such Transfers are allegedly avoidable, including but not limited to . . . loan payments on the TMCC Obligations of at least $206,000[.]" (Settlement Agreement at 2, Docket No. 1-7.)  TMCC denied that the transfers were avoidable.  (*Id.*)  TMCC refused to release its liens on Brainerd and JHB until it had a resolution of the preference issue.  (Tr. of Proceedings at 28, Nov. 25, 2009, Trustee's App. at AA60, Docket No. 7.)

The Bankruptcy Court did not approve the proposed settlement.  (Mot. for Approval of Settlement ¶ 7, Bankr. Docket No. 315.)

On November 12, 2009, Toyota Motor Sales obtained an order granting it relief from the automatic stay so that it could terminate its dealership agreement with Brainerd, and it indicated that it would terminate the dealership agreement by the end of November 2009 if a sale was not completed.  (Mot. for Approval of Settlement ¶ 8, Bankr. Docket No. 315.)

The Trustee entered into negotiations, and negotiated a sale to Walser of the assets of the Brainerd Dealership and of the real estate owned by JHB.  (Mot. for Approval of Settlement ¶ 10, Bankr. Docket No. 315.)  Hecker was not involved in this second round of negotiations.  (*Id.*)  The Trustee told the Bankruptcy Court that his "goal in negotiating this sale was to (a) realize value from Brainerd by way of making a preference recover,

(b) ensure the creditors of Brainerd were paid and, (c) to protect the estate from adverse tax consequences."  (Mot. for Approval of Settlement ¶ 10, Bankr. Docket No. 315.)  The Trustee's goal was to recover at least $450,000 – the amount Hecker would have received in cash if the Bankruptcy Court had approved the first settlement.  (Mot. for Approval of Settlement ¶ 16, Bankr. Docket No. 315.)

The Trustee reached agreements with Walser and TMCC.  According to the Trustee,

> Walser agreed to purchase Brainerd for a price exceeding $3.1 million dollars and to assume Brainerd's debt to TMCC, an amount in excess of $5 million dollars.  TMCC agreed to release its liens against all assets of the Dealership and to pay the Trustee $425,000 from the sale proceeds as a settlement of preference claims against TMCC up to $425,000.

(Trustee's Resp. in Opp'n to Mot. for Leave to Appeal & Mot. to Dismiss Appeal as Moot at 2, Docket No. 1-7.)  The Asset Purchase Agreement directs Walser to pay the purchase price by wiring money to various recipients, including $425,000 to the Trustee, "representing the Settlement payment as defined by a settlement agreement by and between the Trustee, [Brainerd], and TMCC dated November 20, 2009," and "$2,508,029 to TMCC as partial payment for the amounts owed on account of [Brainerd]'s secured loan obligations."  (Asset Purchase Agreement at 3, Docket No. 1-7.)  The Asset Purchase Agreement provides that "TMCC shall, at the Closing, release its security interest in the Dealership Assets."  (Asset Purchase Agreement at 7, Docket No. 1-7.)

According to the Real Estate Purchase Agreement, Walser agreed to pay $5,294,058.16 to JHB for the Brainerd Dealership's land and buildings.  (Real Estate Purchase Agreement, Docket No. 1-7.)  The Real Estate Purchase Agreement required JHB to obtain written approval from TMCC for the transaction.  (*Id.* at 3.)

The Trustee simultaneously entered into a settlement agreement with TMCC (the "Settlement Agreement").  TMCC was concerned that under the proposed transaction between the Trustee and Walser, "TMCC would not receive full payment at closing for the TMCC Obligations."  (Settlement Agreement at 2, Docket No. 1-7.)  The Trustee agreed "to settle and resolve any claims it may have against TMCC with respect to the Transfers to the extent of $425,000 in exchange for a payment of $425,000, . . . . [but] the Trustee would retain claims, if any, against TMCC beyond that amount."  (Settlement Agreement at 3, Docket No. 1-7.)  The Trustee agreed to this sum, rather than the $450,000 he had originally sought, as a compromise "in order to accommodate unsecured creditors' claims."  (Mot. for Approval of Settlement ¶ 16, Bankr. Docket No. 315.) TMCC agreed "to release its liens upon the" dealership assets and property provided that it would receive at least $5,055,153 from the proceeds of the real property and at least $2,508,029 from the sale of the dealership assets.  (Settlement Agreement at 3, Docket No. 1-7.)  As a result of this Settlement Agreement, the dealership assets and the real estate could pass to Walser free and clear of TMCC obligations.  (Settlement Agreement, Docket No. 1-7.)

On November 20, 2009, the Trustee filed a Motion for Approval of Settlement Agreement and Abandonment and for Expedited Hearing, seeking consent to the sale of the assets of Brainerd to Brainerd T, LLC ("BTL"), a Walser entity, and of the assets of JHB to Walser Real Estate IV, LLC ("WRE").  (Mot. for Approval of Settlement ¶ 4, Bankr. Docket No. 315.)  In that motion, the Trustee disclosed that Cornerstone Bank may "claim a security in the Debtor's equity interests and the assets of the Debtor.  The claims of . . . Cornerstone, in the Trustee's opinion, far exceed the value of the Debtor's

corporate interests." (Mot. for Approval of Settlement ¶ 9, Bankr. Docket No. 315.)  The Trustee set an expedited hearing date of November 25, 2009.

On November 24, 2009, Cornerstone filed an objection to the motion. Cornerstone asserted a security interest in all of Hecker's general intangibles, including his equity in Brainerd and JHB.  The premise of Cornerstone's argument is that if the Trustee is allowed to characterize the settlement with TMCC as a preference recovery, the proceeds of the settlement are payable to Hecker's unsecured creditors, and Cornerstone has no superior interest in those proceeds.  If, however, the settlement with TMCC is more properly characterized as a sale of Hecker's interest in one or more LLCs, Cornerstone has a secured interest in the sale proceeds, because Hecker's ownership interests in the LLCs are general intangibles.  (*See* Cornerstone's Objection to Trustee's Mot. for Approval of Settlement Agreement at 2, Bankr. Docket No. 317.)

Cornerstone requested that the Bankruptcy Court hold an evidentiary hearing to determine the legitimacy of the Trustee's motion, but the court denied the request. Cornerstone challenged the Trustee's conclusion that a preference had occurred.  (Mot. for Leave to Appeal, Docket No. 1-3.)  Cornerstone argued that the Trustee did not show that "Hecker actually tendered his own funds to [TMCC] and not the funds of [Brainerd], a non-debtor.  In addition, the Trustee failed to provide any information regarding the amount of funds [TMCC] was owed 90 days prior to the bankruptcy filing[.]"  (*Id.* at 2.) Cornerstone claimed that "[t]he settlement proceeds are disguised as a preference to avoid Cornerstone's security interests in Denny Hecker's general intangibles."  (*Id.*)

During the November 25, 2009 hearing, counsel for the Trustee and counsel for TMCC emphasized to the Bankruptcy Court that TMCC's first priority liens in all of the

Brainerd Dealership assets and in the JHB real property exceeded the value of those assets, and as a result, TMCC "is not being paid in full in this transaction." (*Id.* at 8; *see id.* at 27 ("[TMCC] is not getting paid in full at closing.").)   Cornerstone has never objected to this characterization of the facts.

With respect to the preference issue, counsel for the Trustee represented to the Bankruptcy Court that even if TMCC "is fully secured as to" Brainerd and JHB, TMCC could still "be the recipient of a preference from the Debtor."  (Tr. of Proceedings at 14, Nov. 25, 2009, Trustee's App. at AA46, Docket No. 7.)  Counsel for the Trustee further argued that "if the preference issue was not resolved, I do not believe that [TMCC] would proceed with this transaction and the transaction would crater leaving nothing for Cornerstone or the estate." (*Id.* at 15.)   He cautioned against the Bankruptcy Judge modifying the proposed transaction to allow the proceeds to be subject to Cornerstone's liens, if any.  (*Id.* at 17.)  He expressed "a concern . . . that I don't know that [TMCC] would go ahead and proceed with the transaction if that were to occur because they would be potentially exposed to preference claims if it was later determined that . . . these proceeds were really equity and subject to Cornerstone's liens and not the preference recovery." (*Id.*)

Counsel for TMCC confirmed these concerns.  He stated that TMCC was unwilling to release its liens for less than the full value at closing, as called for in the agreements, if it would "be subject to a preference attack later." (*Id.* at 28.)  According to counsel for TMCC, if such a preference attack

> succeeded then that would increase the amount and the size of the [TMCC] secured claim and depending on when that action is brought, if it occurs after this closing, all of the other funds that would go to the estate or to

unsecured creditors would have been disbursed and there would be no proceeds back for [TMCC] to recover.

So from that standpoint Toyota was unwilling to release its liens unless we have a resolution of this preference issue and that's why it's an integral part of this matter.

(*Id.*)

Counsel for the Trustee also cautioned of potentially significant tax consequences to the bankruptcy estate of alternative approaches.  (*Id.* at 9-10.)  If the Trustee were to pursue one such alternative, "[t]he end result could be that the Estate would receive this money and then receive an even larger tax bill." (*Id.* at 10.)  The proposed arrangement, however, would result in the Trustee abandoning any interest in Brainerd and Jacob Properties.  "The effect of the abandonment would be to place the tax consequences of the transactions related to the real estate back to Mr. Hecker." (*Id.*)  Hecker did not object to the proposed abandonment and was willing to take on the risk of the additional tax consequences.  (*Id.*)

The Bankruptcy Court overruled Cornerstone's objections, granted the Trustee's motion, and approved the settlement.  (Docket No. 1-7.)  The Bankruptcy Court made the following findings:

[T]here are several components here, sort of this settlement of the **preference action which certainly based on the record I have is legitimate.**  There certainly are legitimate preference claims that the Trustee has out here which he's releasing only in part which makes it even – seems to me a better deal for the estate and it seems to me **that's a reasonable settlement of the preference claims** and it is not some sort of subterfuge that's been suggested, especially in light of – the record is pretty clear of everything I have read both as part of this motion, the earlier motion, that **there is no value here in these dealerships for anyone other than the creditors of the dealerships**, both of the real estate and the operator of the dealership.  **There's no indication that there's – under any circumstances any value that would ever flow down to the equity** which is essentially what Cornerstone is looking for.  It's looking for a sale

or something that's going to pay all the creditors in full and then have value flow down to the owner, the LLCs, which they hope would flow value to them as a secured creditor of the equity.

There's just no indication that that exists, so it seems to me it made perfect sense not to ascribe any value to that.  **I don't see** in [sic] **subterfuge going on there.**

As to the abandonment, the Trustee has presented in this motion . . . plenty of evidence to indicate that the property to be abandoned is of inconsequential value to the estate and/or may be burdensome.  Even if it's not burdensome there's – I don't understand the tax consequences anyway. I take the Trustee at his word that at least there's a potential for them, but even if those are adverse consequences that makes it burdensome, but absent that there seems to me there's no value here and the Trustee has demonstrated that and I am not in a position because others have shown up and said, well, maybe – maybe the Trustee is wrong.  That doesn't provide me with any evidence which I can determine that there may be value . . . .

I just think **this whole transaction**, the settlement part, the sale part, the abandonment part all is a good deal for the estate.  It **benefits the estate.  It compromises things that would be costly and expensive and uncertain in result and that and alone leads me to approve the sale**, but I am not impervious to the things suggested by Mr. Anderson[, counsel for Walser].  It gets money to creditors who may not be direct creditors in this estate, but there are people who are owed money who need money who get paid, jobs being preserved, part of the local economy is being assisted and preserved, and while not technically part of the basis for my holding, so I guess I'm happy with that result.

So I will grant the motion and approve the transaction as proposed by the Trustee[.]

(Tr. of Proceedings at 33-35, Nov. 25, 2009, Trustee's App. at AA65-67, Docket No. 7 (emphases added).)   The sale transaction closed later on November 25 and on November 26, 2009.   The Brainerd Dealership reopened under new ownership on November 27, 2009.

On December 7, 2009, Cornerstone filed a motion for leave to appeal from the Bankruptcy Court's Order of November 25, 2009.  The Trustee opposed the motion for leave to appeal, arguing that the issue was moot because Cornerstone did not obtain a stay of the sale, and because the sale of assets had already closed.  (Trustee's Resp. in

Opp'n to Mot. for Leave to Appeal & Mot. to Dismiss Appeal as Moot, Docket No. 1-7.) The Trustee requested that the Court consider the opposition to be both an opposition and "an independent motion to dismiss the appeal." (*Id.* at 10.)

On December 21, 2009, Cornerstone filed its notice of appeal from the Bankruptcy Court's Order of November 25, 2009, authorizing the sale of assets of the debtor free and clear of interests. (Docket No. 1.) Cornerstone elected to have the District Court hear the appeal, pursuant to 28 U.S.C. § 158(c)(1)(A). (Docket No. 1-4.)

On appeal, Cornerstone emphasizes that it does "not object to the actual sale." (Appellant's Reply Br. at 8, Docket No. 8.) Rather, Cornerstone "assert[s] an interest in the sale proceeds." (*Id.*) Cornerstone argues that the Bankruptcy Court abused its discretion by approving the Asset Purchase Agreement and the Real Estate Purchase Agreement with Walser and the Settlement Agreement with TMCC without analyzing whether TMCC had a legitimate preference action. Cornerstone further argues that the Bankruptcy Court abused its discretion by failing to hold an evidentiary hearing with respect to Cornerstone's security interest in the settlement proceeds.

## ANALYSIS

### I.    Standard of Review

The Court reviews "the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *See Official Comm. of Unsecured Creditors v. Farmland Indus., Inc.* (*In re Farmland Indus., Inc.*), 296 B.R. 188, 192 (B.A.P. 8th Cir. 2003). "A finding of fact will not be reversed as clearly erroneous unless the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Id.*; *see also* Fed.

R. Bankr. P. 8013 ("On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

"On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. Bankr. R. 9019.  "A decision to approve or disapprove a proposed settlement under Bankruptcy Rule 9019 is within the discretion of the bankruptcy judge."  *ReGen Capital III, Inc. v. Official Comm. of Unsecured Creditors* (*In re Trism, Inc.*), 282 B.R. 662, 666 (B.A.P. 8th Cir. 2002).  Therefore, on appeal, the district court will not disturb that decision "absent a clear abuse of discretion."  *TCF Banking & Sav. v. Leonard* (*In re Erickson*), 82 B.R. 97, 99 (D. Minn. 1987).

> In exercising its discretion the bankruptcy court is to weigh four factors bearing on the reasonableness of the settlement: (1) likelihood of success in the litigation; (2) the difficulties, if any, in the matter of the collection; (3) the complexity of the litigation and the attendant inconvenience, expense, and delay; and (4) the paramount views of the creditors and the proper deference to their reasonable views.

*Id.* at 99.  "An abuse of discretion occurs when the court does not determine and weigh these factors and either approve or reject the proposed settlement."  *In re Trism*, 282 B.R. at 667.  "An abuse of discretion [also] occurs if the court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Id.* at 666-67.  In addition,

> An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper

factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment. A court's decision will not be disturbed as long as it is within the range of discretion afforded to a given determination and is not influenced by a mistake of law.

*Hoffman v. Bullmore* (*In re Nat'l Warranty Ins. Risk Retention Group*), 384 F.3d 959, 962 (8th Cir. 2004) (citation and internal quotation marks omitted).

## II.    Mootness

The Trustee argues that Cornerstone's appeal is moot because the sale has closed and because non-adverse third parties have made substantial economic commitments in reliance on the court-approved Settlement Agreement. (Appellee's Br. at 14, Docket No. 6.) The Trustee argues that this Court cannot undo the transaction and therefore it cannot provide any remedy. (*Id.* at 15-17.) Cornerstone argues that the appeal is not moot because it objects to the Bankruptcy Court's determination of who is entitled to the proceeds of the sale, not to the sale itself. (Appellant's Reply Br. at 7, Docket No. 8.)

The Court finds that Cornerstone's appeal is not moot. "[A]n appeal from an order authorizing a sale of realty and payment of a portion of the proceeds is not rendered moot by the fact that the property has been sold without a stay pending appeal[.]" 9E Am. Jur. 2d Bankr. § 3794. This Court "has the power to fashion effective relief because in the event of an adverse decision," it could order that the funds be repaid. *Id.*; *see, e.g.*, *IRS v. Valley Nat'l Bank* (*In re Decker*), 199 B.R. 684, 687 (B.A.P. 9th Cir. 1996). If Cornerstone were to prevail, the Court could order the Trustee to direct some of the bankruptcy estate's proceeds from the transaction to Cornerstone. The Trustee has not offered any evidence to show that those proceeds are unavailable. *See Forbes v. Forbes*

- 14 -

(*In re Forbes*), 215 B.R. 183, 188 (B.A.P. 8th Cir. 1997) ("An appeal is moot in this sense only if events have taken place during the pendency of the appeal that make it impossible for the court to grant any effectual relief whatever." (internal quotation marks omitted)).

The cases the Trustee cites are inapposite. In *Reagan v. Wetzel* (*In re Reagan*), the appeal was moot because the appellant sought to have the order authorizing the sale overturned, but the sale had already closed by the time the court heard the appeal. 403 B.R. 614, 620 (B.A.P. 8th Cir. 2009). In *United States v. Fitzgerald*, the appeal was moot because the appellants sought to have the sale set aside. 109 F.3d 1339, 1341-42 (8th Cir. 1997). The sale in *Van Iperen v. Production Credit Association of Worthington-Slayton Branch* (*In re Van Iperen*) involved the sale of property that was part of the bankruptcy estate. 819 F.2d 189, 190-91 (8th Cir. 1987) (per curiam). As the Trustee concedes, the sale here was not of bankruptcy estate property. (Appellee's Br. at 16, Docket No. 6.)

## III.   Cornerstone's Arguments on Appeal

Cornerstone does not object to the sale price or to the sale itself. Cornerstone objects only "to the settlement of the alleged preference between the Hecker bankruptcy estate and TMCC." (Appellant's Br. at 3, Docket No. 4.) Cornerstone argues that the proceeds from the sale of the assets and real property "funded the preference settlement circumventing Cornerstone['s] security interest in [Hecker's] general intangibles—the proceeds received from the sale of the [assets of the] Hecker [Dealership]." (*Id.*) Cornerstone argues that the Bankruptcy Court should not have concluded that the proceeds of the settlement with TMCC were free and clear of any liens or encumbrances of Cornerstone. (*Id.* at 6.)

### A.   The Bankruptcy Court Did Not Clearly Err in Finding That an Actual Preference Occurred.

Cornerstone argues that the Bankruptcy Court "and the Trustee failed to satisfy the requirements necessary to demonstrate that an actual preference occurred." (Appellant's Br. at 16, Docket No. 4.)  Cornerstone suggests that TMCC never would have been subject to a preference action because TMCC was fully secured ninety days before Hecker filed his bankruptcy petition. (*Id.* at 14.)

As the Trustee notes, however, "for the preference analysis, the focus is on the Debtor's assets, and not those of the limited liability companies." (Appellee's Br. at 14, Docket No. 6.)  "[A]s to the Debtor, TMCC was an unsecured creditor.  By accepting payments of the Debtor's funds and his membership units within 90 days of the filing of the bankruptcy, TMCC became exposed to a preference claim." (*Id.*)

The Bankruptcy Court found that "[t]here certainly are legitimate preference claims," and that finding was not clearly erroneous.  (*See* Tr. of Proceedings at 33, Nov. 25, 2009, Trustee's App. at AA65, Docket No. 7.)  Hecker's Statement of Financial Affairs lists payments that Hecker made to TMCC within the ninety-day preference period.  Counsel for the Trustee also confirmed that Hecker transferred his membership certificates for Brainerd to TMCC.  TMCC acknowledged the existence of these payments and transfers and the potential preference claims arising out of them, stating that TMCC would not release its liens unless the preference issue was resolved.  Based on this information, the Bankruptcy Court's determination that an actual preference occurred was not clear error.

Cornerstone further contends that "[t]he Trustee failed to provide evidence whatsoever as to the alleged amount of the TMCC preference." (Appellant's Br. at 19, Docket No. 4.)   Cornerstone asserts that "the preference claim could not exceed $205,000.00.   It was incomprehensible that TMCC would settle a preference claim for $220,000.00 more than the value of the claim." (*Id.* at 23.)

Cornerstone ignores the Bankruptcy Court's conclusion that the preference extended to the $203,640 that Hecker reported in his Statement of Financial Affairs, as well as the original Brainerd membership certificates that Hecker transferred to TMCC. (*See* Settlement Agreement at 2, Docket No. 1-7.)   Moreover, it is plausible that TMCC was willing to settle the preference claim for more than the value of the claim simply to avoid litigation and to resolve uncertainty about the potential preference action.

> ### B.     The Bankruptcy Court Did Not Abuse Its Discretion in Approving the Settlement.

Cornerstone does not directly address the first three factors a Bankruptcy Court must weigh in exercising its discretion to approve a proposed settlement under Bankruptcy Rule 9019.   Cornerstone argues, however, that the Bankruptcy Court "did not evaluate the fourth factor to determine whether Cornerstone had a paramount interest." (Appellant's Br. at 13, Docket No. 4.)   The fourth factor is "the paramount interest of the creditors and a proper deference to their reasonable views." *In re Trism*, 282 B.R. at 667. But the Bankruptcy Court must not view this factor in isolation.   Rather, the court "must **weigh** [the] four factors bearing on the reasonableness of the settlement." *Id.* (emphasis added).

The Bankruptcy Court weighed all four factors in approving the proposed settlement. First, the court considered the likelihood of success in the litigation. The court noted that the transaction benefitted the estate because "[i]t compromises things that would be . . . uncertain in result." (Tr. of Proceedings at 35, Nov. 25, 2009, Trustee's App. at AA67, Docket No. 7.) The court further noted that the preference claims were released only up to $425,000, giving the Trustee the opportunity to pursue additional preference claims against TMCC if further investigation revealed that the preferences had a value greater than that sum. (*Id.* at 33.) Second, the court considered the difficulties in collection matters. The court considered that the dealership had no equity extending beyond TMCC's first priority liens, and that TMCC refused to approve of the transaction unless the preference action was resolved. (*Id.*) The court also considered the likelihood that the dealership would become worthless in a matter of days if the transaction did not go forward, because Toyota Motor Sales intended to terminate its dealership agreement with Brainerd if the dealership was not sold by November 30, 2009. (*See* Mot. for Approval of Settlement ¶ 8, Bankr. Docket No. 315.) Third, the court considered the complexity of the litigation and the attendant expense, inconvenience, and delay. The court noted that "there is no value here in these dealerships for anyone other than the creditors of the dealerships," demonstrating that there was no reason to delay the transaction. (Tr. of Proceedings at 33, Nov. 25, 2009, Trustee's App. at AA65, Docket No. 7.) The court also noted that "the property to be abandoned is of inconsequential value to the estate and/or may be burdensome" because of potential tax consequences. (*Id.* at 34.) The court also found that the transaction "compromises things that would be costly and expensive." (*Id.* at 35.)

With respect to the fourth factor, the court considered and rejected Cornerstone's views as to the alleged "subterfuge" of characterizing as a preference settlement what Cornerstone viewed as a sale of Hecker's ownership interests in Brainerd and Jacob Properties. The court found that the partial settlement of the preference action – up to $425,000 – was "a reasonable settlement of the preference claims and it is not some sort of subterfuge . . . especially in light of . . . the record . . . that there is no value here in these dealerships for anyone other than the creditors of the dealerships." (*Id.* at 33.) The court refused to "ascribe any value to" Cornerstone's contention that there could be "a sale or something that's going to pay all the creditors in full and then have value flow down to the owner, the LLCs, which they hope would flow value to them as a secured creditor of the equity." (*Id.* at 34.)

The Bankruptcy Court determined and weighed the four factors, and its conclusions were not based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *See In re Trism*, 282 B.R. at 666-67. The Bankruptcy Court therefore did not abuse its discretion in approving the Settlement Agreement. *See id.*

Cornerstone further argues that "[t]he only rational[e] for the Trustee to bundle a sale of assets free and clear of liens and encumbrances along with a settlement of a preference claim with TMCC was to have the sale of assets fund the preference claim." (Appellant's Br. at 15, Docket No. 4.) This bundling, Cornerstone argues, "was for no other purposes other than to circumvent the security interest of Cornerstone Bank and to provide the estate with funds to pay the Trustee's legal counsel." (*Id.* at 16.)

The bundling was critical to effectuating the entire transaction. As the Trustee notes, because TMCC's first priority liens exceeded the value of the dealership assets and

real property, there was no equity in those assets and property.  (Appellee's Br. at 10, Docket No. 6.)  Hence, "there was no collateral of value to which Cornerstone's claimed security interest could attach."  (*Id.*)  Moreover, "TMCC consented to the closing only because the Settlement Agreement eliminated TMCC's preference exposure." (Appellee's Br. at 15, Docket No. 6.)  Without TMCC's consent, the transaction would have failed.  As the Bankruptcy Court found, the entire transaction "is a good deal for the estate.  It benefits the estate."  (Tr. of Proceedings at 35, Nov. 25, 2009, Trustee's App. at AA67, Docket No. 7.)  Bundling the settlement of the Trustee's preference claim against TMCC was therefore part of this good deal and benefitted the estate.

### C.   The Bankruptcy Court Did Not Abuse Its Discretion in Denying Cornerstone's Request for an Evidentiary Hearing.

Cornerstone argues that "[i]n order to properly determine the issues relating to Cornerstone's security interest in the proceeds the Trustee received from the sale of Hecker's interest in Brainerd Imports and Jacob Holdings, the . . . [B]ankruptcy [C]ourt needed to hold an evidentiary hearing."  (Appellant's Br. at 13, Docket No. 4.) Cornerstone contends that a hearing was necessary "to determine whether Cornerstone['s] security interest in general intangibles extended to the proceeds the Trustee received from the sale[.]"  (Appellant's Br. at 21, Docket No. 4.)

A Bankruptcy Court "has no discretion to enforce a settlement where material facts are in dispute; an evidentiary hearing must be held to resolve such issues."  *City Equities Anaheim, Ltd. v. Lincoln Plaza Dev. Co.* (*In re City Equities Anaheim, Ltd.*), 22 F.3d 954, 958 (9th Cir. 1994).  The disputed facts must be material, however.  "Rule 9019 does not require an evidentiary hearing on every settlement agreement presented to the

Court." *In re Kent*, No. 07-3238, 2008 WL 5047821, at *1 (Bankr. D. Ariz. July 24, 2008); *see Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 ("In light of the unambiguous language of the Rule 9019(a) and the absence of any cogent case law to support Mr. Depoister's position, we believe that the bankruptcy court was not obligated to conduct an evidentiary hearing as a prerequisite to approving the compromise. Accordingly, the bankruptcy court's failure to conduct an evidentiary hearing, without more, is not reversible error.").

Here, the disputed facts with respect to the preference action were not material, and therefore an evidentiary hearing was unnecessary. Cornerstone's security interest in Hecker's general intangibles is only relevant if the value of the assets of the Brainerd Dealership and the JHB real estate exceeds the value of TMCC's first priority security interests on those assets. But Cornerstone has never disputed that the opposite was true. TMCC's first priority claims exceeded the value of that collateral. The Bankruptcy Judge therefore correctly found that there was "no value here in these dealerships for anyone other than the creditors of the dealerships, both of the real estate and the operator of the dealership." (Tr. of Proceedings at 33-34, Nov. 25, 2009, Trustee's App. at AA65-66, Docket No. 7.) Because there was no set of circumstances under which "any value . . . would . . . flow down to the equity," there was no need for an evidentiary hearing with respect to Cornerstone's security interest. (*Id.* at 34.)

## ORDER

Based on the foregoing and all the files, records, and proceedings herein, the Court **AFFIRMS** the Order of the Bankruptcy Court dated November 25, 2009, granting the

Trustee's Motion to approve a settlement agreement [Bankr. Docket No. 320].   The

Trustee's motion to dismiss the appeal [Bankr. Docket No. 336] is **DENIED**.


DATED:   August 30, 2010                    s/ John R. Tunheim
at Minneapolis, Minnesota.                  _____
                                            JOHN R. TUNHEIM
                                            United States District Judge